IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| **INSYS THERAPEUTICS, INC.,** § | | |
| Plaintiff, § | | |
| § | Civil Action No. ___- cv-_____ | |
| v. § | | |
| § | Judge _____ | |
| **SUNRISE LEE,** § | | |
| Defendant. § | | |

## COMPLAINT

Plaintiff Insys Therapeutics, Inc. brings this Complaint against Defendant Sunrise Lee and in support thereof states, as follows:

### A.  PARTIES

1.  Plaintiff INSYS THERAPEUTICS, INC. ("Insys" or the "Company") is a Delaware corporation with its principal place of business in Chandler, Arizona. Insys Therapeutics, Inc. operates through its wholly-owned subsidiary Insys Pharma, Inc., a Delaware corporation with its principal place of business in Chandler, Arizona.  These entities report earnings on a consolidated basis.

2.  Upon information and belief, Defendant SUNRISE LEE ("Lee") is a resident of Byron Center, Michigan, and may be served with process by service at her residence, 680 Gardenview Drive, Byron Center, Michigan 49315.

### B.  JURISDICTION AND VENUE

3.  This Court has jurisdiction in this Action under 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Delaware and Arizona and Defendant is a citizen of Michigan, and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4. Venue is proper in this District because Defendant resides in the Western District of Michigan and Defendant is subject to personal jurisdiction in the Western District of Michigan. *See* 28 U.S.C. § 1391.

### C. PRELIMINARY STATEMENT

5. Plaintiff Insys is a specialty pharmaceutical company that develops and commercializes innovative supportive care products.

6. Defendant Lee was previously employed by Insys in a highly-compensated senior managerial sales position.

7. To become employed by Insys, Lee lied about her qualifications on her resume and application.

8. During her employment with Insys, Lee improperly (a) participated in an outside toxicology businesses, in conflict with the interests of the Company, without the Company's authorization, (b) utilized her position and professional relationships at Insys to actively and successfully recruit other sales personnel to join the outside toxicology businesses for her own personal gain, and (c) leveraged and exploited her health care provider ("HCP") connections, which were established through her employment at Insys, to provide such HCPs with toxicology services for her own personal gain.

9. These unauthorized activities violated several Company policies and Lee's contractual obligations, as well as Lee's common law obligations as a full-time employee, agent and fiduciary of Insys.

10. Lee has been terminated for Cause in connection with her improper and unauthorized conduct.

### D.  FACTS

*Insys's Background*

11. Among other commercial endeavors, Insys currently develops and markets Subsys, an opioid agonist indicated for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and who are tolerant to opioid therapy for their underlying persistent cancer pain. Patients must remain on around-the-clock opioids when taking Subsys. Subsys is a transmucosal immediate-release fentanyl (TIRF) product that delivers fentanyl, an opioid analgesic, for transmucosal absorption underneath the tongue.

12. Insys promotes Subsys using a highly targeted approach designed to maximize impact with HCPs who are TIRF Risk Evaluation and Mitigation Strategy (REMS) enrolled. Enrollment in the TIRF-REMS program is required by the FDA as of March 2012 in order to prescribe TIRF products.  Among other things, HCPs who prescribe Subsys are advised by Insys to monitor their patients' use of the prescribed drugs carefully for opioid toxicity, which may cause fatal respiratory depression, and to ensure the patients are using and not illegally selling them, by ordering toxicology screenings on those patients. These toxicity services provide an important, independent "check and balance" mechanism.

13. Insys employs a Senior Vice President of Sales, who supervises two or three Regional Sales Directors for the East, West and Central regions.  Regional Sales Directors oversee a number of District Sales Managers, who supervise sales representatives in those districts.

14.  Insys has spent a significant amount of time and money over the last several years in training its sales force and educating a network of HCPs that prescribe Insys products on the clinical benefits of its products to patients.  As the medical community has increasingly

grown to understand Subsys's unique clinical attributes and potential benefits to patients, sales of Subsys have continually increased since its commercial launch in March 2012 and the Company's sales organization and infrastructure have grown significantly over the past several years.  During this period, the Company has also expended a great deal of time and money on obtaining prescription and market data, and market research studies related to Subsys.

15. Like their peers in the pharmaceutical industry, Insys sales professionals can receive significant compensation if they properly and effectively perform their position.

16. Upon its launch in March 2012, Subsys was the sixth entrant into the existing TIRF market. Accordingly, the Company's sales and marketing efforts have primarily targeted the top physicians prescribing the existing TIRF products that preceded Subsys in the market. These efforts have been very successful and many of the top physician prescribers in the TIRF-REMS program prescribe Subsys for their patients.  Insys's sales approach has resulted in Subsys having the highest market share percentage of any TIRF product.

*Insys Policies and Agreements*

17. Policy 110 (Conflict of Interest), contained in the Insys Handbook for New Employees, requires that: "Employees should always act in the best interest of INSYS . . . and not permit outside interests to interfere with their job duties. This policy prohibits all employees from using their position with INSYS or relationships with INSYS clients, customers, physicians, patients, vendors, suppliers, contractors or advisors for private gain or to obtain benefits for themselves or members of their family.  Employees have an obligation to conduct business within guidelines that prohibit actual or potential conflicts of interest. . . . For purposes of this policy, a potential or actual 'conflict of interest' occurs when an employee's outside interests (for example, financial or personal interests) interfere with the interests of INSYS or

the INSYS employee's work-related duties or when an employee is in a position to influence a decision that may result in a personal gain for that employee or for a relative. . . . If you become aware of any potential conflict of interest or ethical concern regarding your employment or another employee at INSYS, you must promptly speak to, write or otherwise contact the head of INSYS Human Resources Department (or the head of the Compliance or Legal Departments), as soon as possible."

18. Policy 111 (Outside Employment), contained in the Insys Handbook for New Employees, requires that: "Employees are required to obtain written approval from their supervisor before participating in outside work activities. Approval will be granted unless the activity conflicts with the Company's interest. In general, outside work activities are not allowed when they: Prevent the employee from fully performing work for which he or she is employed at the Company, including overtime assignments; Involve organizations that are doing or seek to do business with the Company, including actual or potential vendors or customers; or Violate provisions of law or the Company's policies or rules."

19. All employees are provided with a copy of the Insys Handbook for New Employees, which includes Policy 110 (Conflict of Interest) and Policy 111 (Outside Employment), upon commencement of employment. A copy of the Insys Handbook for New Employees is readily available and accessible on the Company's information website.

20. Under the Insys Proprietary Information and Inventions Assignment Agreement (the "Proprietary Agreement"), Insys employees agree, as a condition of employment with the Company, among other things, that they will not, either directly or indirectly: (a) at any time, use or disclose Insys's proprietary information which includes information regarding customers, including HCPs, or skills of employees, (b) engage in any employment or business activity that

would conflict with their employment at the Company without the Company's express written consent, or (c) during and for the one-year period following employment by Insys, solicit or attempt to solicit any employee, independent contractor, or consultant of Insys to terminate his, her or its relationship with Insys in order to become an employee, consultant, or independent contractor to or for any other person or entity.

21. The Insys Therapeutics Confidential Information Policy (the "Confidentiality Agreement") provides that, among other things, (a) Insys employees must not use or disclose Insys's confidential information, except within the scope of employment, (b) Insys employees must surrender all Company documents and information upon termination of employment, and (c) obligations under the Confidentiality Agreement continue after employment with the Company has ended.

22. All Insys employees are required to review, acknowledge and agree to these policies and contracts.

### *Defendant's Employment with Insys*

23. Lee was hired by Insys on August 17, 2012 as Regional Sales Manager, Mid-Atlantic.

24. On September 2, 2013, Lee was promoted by the Company to Regional Sales Director, Central. Lee later became the Regional Sales Director, Western. In this role, one of Lee's direct reports was Lance Clark ("Clark"), District Sales Manager, STL.

25. On September 19, 2012, Lee entered into the Proprietary Agreement.

26. On September 17, 2012, Lee executed the Confidentiality Agreement.

27. On July 31, 2013 and October 18, 2013, Lee acknowledged and accepted responsibility for complying with all Insys policies and procedures.

28.     Lee was paid a substantial base salary and bonuses throughout her employment. She also received several stock option awards pursuant to the Insys Therapeutics, Inc. 2013 Equity Incentive Plan ("Equity Plan").

29.     Under the Equity Plan, upon termination of employment for Cause, stock option awards terminate immediately and the exiting employee is prohibited from exercising them from and after the date of termination for Cause. Cause includes the occurrence of, among other things, any of the following events:

> …(ii) participation (whether by affirmative act or omission) in a fraud or felonious act against the Company and/or its Affiliates, (iii) conduct which, based upon a good faith and reasonable investigation by the Company, demonstrates unfitness to serve, (iv) violation of a statutory or fiduciary duty, or duty of loyalty owned to the Company and/or its Affiliates and which has a material adverse effect on the Company and/or its Affiliates…(vi) breach of any material term of any contract, or (vii) violation of any material Company policy.

30.     The Option Agreement under the Equity Plan provides that the term of the option expires immediately upon termination for Cause and cannot be exercised thereafter.

31.     Lee also participated in the Insys Therapeutics, Inc. 2013 Employee Stock Purchase Plan, which allowed her to purchase common stock at, effectively, a 15% discount.

32.     Lee's employment with the Company was terminated March 10, 2015. The Company nevertheless continued to pay Lee's base salary through April 8, 2015, when the Company determined it had Cause for Lee's termination as a result of her blatant and significant violations of Policy 110 (Conflict of Interest) and Policy 111 (Outside Employment), her obligations under the Proprietary Agreement and the Confidentiality Agreement and her common law obligations as a full-time Insys employee.

*Defendant's Misconduct*

33.     In applying for employment with Insys, Lee claimed, both on her application and resume, that she had graduated from Michigan State University with a Bachelor's of Science degree in Microbiology.

34.     In her application, Lee certified that "answers given herein are true and complete to the best of [her] knowledge" and acknowledged that "[i]n the event of employment, [she understood] that fake or misleading information given in [her] application or interview(s) may result in discharge."

35.     However, a background check conducted recently revealed that Lee did not hold a Bachelor's of Science degree.  In fact, Lee has not earned any college degree.

36.     During Lee's employment at Insys, Lee was actively working for one or more toxicology companies, including Advanced Toxicology LLC.

37.     Lee was introduced to these companies by her direct report, Clark, who was actively working for and potentially owned these outside businesses.

38.     Lee acted as a direct supervisor to Clark and had full knowledge that Clark was engaging in the outside toxicology businesses in violation of Company policies and Clark's contractual obligations to Insys.

39.     Lee not only allowed Clark to continue to engage in the outside toxicology businesses on Insys time and using Insys resources, without notifying Company management, but Lee herself also actively participated in and profited from the outside toxicology businesses at the Company's expense.

40.     Lee engaged in such outside toxicology businesses while doing Insys business and on Insys time, starting no later than October 2014, while continuing to be paid in excess of

8

$219,000 in salary and quarterly bonuses from Insys, and while continuing to exercise stock options granted to her by Insys, valued at more than $155,000.

41. In or about October 2014, Lee attended a training for new hires for the outside toxicology businesses. The training was held in Dallas, Texas, and was conducted by an Insys sales representative who was also working for Clark's outside toxicology businesses while she was employed by the Company.

42. Lee exploited her HCP connections, which were established using the Insys platform solely during her employment at Insys, for her own personal gain. Lee specifically targeted the network of TIRF-REMS participating HCPs that Insys had developed at Insys's significant time and expense, who Lee knew would need toxicology services based upon her interactions with these HCPs during the scope of her duties at Insys. Lee improperly, and in conflict with the Company's interests and written policies, encouraged those HCPs to use Clark's toxicology services in exchange for referral or consulting fees.

43. Moreover, Lee actively recruited Insys sales personnel for Clark's toxicology businesses and told them they would earn a lot of money if they participated.

44. Lee also allowed her direct report, Clark, to utilize his position and professional relationships at Insys to actively and successfully recruit other Insys sales personnel to join these outside business activities for his own personal gain.

45. Lee allowed Clark to approach and pressure a number of Insys sales representatives to sell the outside toxicology services to the HCPs to whom they sold Insys products, and promise the sales representatives they would make a lot of money doing so.

46. Several employees allegedly resigned from Insys in response to monetary disputes with Clark regarding their involvement in his toxicology businesses.

47. Lee also allowed Clark to exploit his and other Insys sales representatives' HCP connections which were established during his and the other sales representatives' employment at Insys for his own personal gain.

48. Lee's misconduct violated several company policies, including Policy 110 (Conflict of Interest) and Policy 111 (Outside Employment), Lee's contractual obligations under the Proprietary Agreement and the Confidentiality Agreement, as well as her common law obligations as a full time employee and fiduciary of Insys.

49. Lee reported to others that she earned at least $10,000 a month in connection with services she provided to Clark's toxicology businesses.

50. Lee's misconduct has caused and will continue to cause significant disruption to the productivity of Insys's sales force and Insys's relationships with HCPs. Had the Company known of Lee's resume and application fraud, it never would have hired her. Had the Company known of Lee's other misconduct, it would have terminated her employment for Cause sooner.

### E. COUNTS

#### *COUNT 1 - Breaches of Contract Against Defendant*

51. Insys incorporates by reference all preceding and succeeding paragraphs of this Complaint.

52. Insys and Lee entered into a valid and enforceable written Proprietary Agreement effective September 19, 2012.

53. Insys and Lee entered into a valid and enforceable written Confidentiality Agreement effective September 17, 2012.

54. On July 31, 2013 and October 18, 2013, Lee acknowledged and accepted responsibility for complying with all Insys policies and procedures.

55. Insys has fully performed its contractual obligations under the Proprietary Agreement, Confidentiality Agreement, Company Policy 110 (Conflict of Interest) and Company Policy 111 (Outside Employment).

56. Lee materially breached the Proprietary Agreement by unlawfully using Company proprietary information relating to customers and skills and compensation of Company employees and soliciting Company employees.

57. Lee materially breached the Confidentiality Agreement by using confidential information for personal gain, outside the scope of her employment.

58. Lee materially breached Company Policy 110 (Conflict of Interest) by using her Insys position and professional relationships for private gain, which created a conflict of interest that was never disclosed to the Company.

59. Lee materially breached Company Policy 111 (Outside Employment) by failing to obtain written approval before participating in unauthorized outside work activities that prevented her from fully performing work for which she was employed and violated Company policies.

60. Lee's breaches, including those set forth above, proximately caused irreparable injury to Insys.

### COUNT 2 - *Tortious Interference with Contracts Against Defendant*

61. Insys incorporates by reference all preceding and succeeding paragraphs of this Complaint.

62. Insys entered into valid and enforceable written contracts with Clark and other Insys sales representatives, including the Proprietary Agreement, the Confidentiality Agreement, Company Policy 110 (Conflict of Interest) and Company Policy 111 (Outside Employment).

63. Insys has fully performed its contractual obligations under these agreements and policies.

64. Lee was aware of the terms of the Company's contracts with Clark and other Insys employees.

65. Lee interfered with the contracts by instigating breaches of contract, without justification, causing Insys employees to breach the terms of the agreements and policies.

66. This interference proximately caused irreparable injury to Insys, causing actual damage and loss.

### *COUNT 3 - Breaches of Fiduciary Duties Against Defendant*

67. Insys incorporates by reference all preceding and succeeding paragraphs of this Complaint.

68. Defendant was employed as a key employee and sales leader by Insys in a position of trust and confidence and was expected to devote her full time and energies to the management and promotion of Insys's business. Lee owed fiduciary duties to Insys including, but not limited to, a duty of loyalty. As a fiduciary, Lee owed Insys duties of loyalty and good faith, integrity of the strictest kind, fair, honest dealing, and the duty not to conceal matters which might influence her actions to Insys's detriment. By virtue of these fiduciary duties, Lee was prohibited from using her fiduciary relationship to further her personal interests at the expense of Insys, except with the full knowledge and consent of Insys.

69. The totality of conduct and actions alleged and ascribed to Lee during her employment by Insys demonstrates that Lee has intentionally, willfully, knowingly, wantonly, recklessly, maliciously, deceptively, fraudulently, in bad faith, and/or in a grossly negligent manner, acted in total disregard of Insys's contractual and other rights and breached the fiduciary

duties, including the duty of loyalty, Lee owed Insys during such period by, among other things, (a) using Insys's proprietary and confidential information for personal gain, (b) soliciting Insys employees while they were employed by Insys, (c) using the professional relationships she had developed with HCPs while employed by Insys for personal gain, (d) abusing her position of power to give preferential treatment to Insys employees whom were complicit in her unlawful activities and retaliating against those whom were not, (e) pursuing personal business interests during work time, and (f) allowing Clark, her direct report, to engage in all of the foregoing.

70. Lee never disclosed her or Clark's outside business activities to Insys and never received consent to engage in such activities.

71. As a consequence of Lee's intentional breaches of her fiduciary duties, including the duty of loyalty, Insys has and will continue to be injured.

72. As a consequence of Lee's intentional breaches of her fiduciary duties, including the duty of loyalty, Insys is entitled to the disgorgement of all compensation, including salary, incentive bonus and stock option award value it paid to Lee during the periods in which she breached her fiduciary duties, plus interest.

73. As a consequence of Lee's intentional breaches of her fiduciary duties, including the duty of loyalty, Insys is also entitled to the profits earned by Lee in connection with unauthorized services provided by Lee while employed by Insys.

### COUNT 4 - *Aiding and Abetting Breaches of Fiduciary Duties Against Defendant*

74. Insys incorporates by reference all preceding and succeeding paragraphs of this Complaint.

75. Clark and other Insys sales representatives owed fiduciary duties to Insys, including the duty of loyalty.

76. Lee was aware of the fiduciary duties owed by Clark and other sales representatives to Insys, including their duties of loyalty.

77. Lee knowingly and successfully induced Clark and other sales representatives to breach the fiduciary duties they owed to Insys, including their duties of loyalty.

78. Lee knowingly participated and substantially assisted in the breaches of fiduciary duties owed by Clark and other sales representatives to Insys, including their duties of loyalty.

79. This knowing inducement of and participation and assistance in breaches of fiduciary duties proximately caused irreparable injury to Insys, causing actual damage and loss.

### F. PRAYER FOR RELIEF

For the foregoing reasons, Insys asks that the Court issue citation for Defendant to appear and answer, and that Insys be awarded a judgment against Defendant for the following:

   a. Actual Damages in an amount expected to significantly exceed $75,000;
   b. Compensation Disgorgement;
   c. Profit Disgorgement;
   d. Equitable Relief;
   e. Exemplary Damages;
   f. Prejudgment and Postjudgment Interest;
   g. Court costs;
   h. Attorney Fees; and
   i. All other relief to which Plaintiff is entitled.

Date: April 20, 2015

        Respectfully submitted,

        */s/ Dean F. Pacific*
        Dean F. Pacific (P57086)
        **WARNER NORCROSS & JUDD LLP**
        900 Fifth Third Center
        111 Lyon Street, N.W.
        Grand Rapids, MI 49503
        616.752.2000
        dpacific@wnj.com

David. E. Schwartz
Risa M. Salins
**SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP**
4 Times Square
New York, NY 10036
212.735.3000
David.Schwartz@skadden.com
Risa.Salins@skadden.com
Requests for admission to be filed

Attorneys for Plaintiff